UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

In re:

HOYT WILLARD COOK, JR., &      CASE NO.: 11-50287-LMK
GLENDA ANN COOK,

    CHAPTER: 7

   Debtors.
_____/

ORDER GRANTING TRUSTEE'S MOTION FOR
TURNOVER AND DENYING CREDITOR CENTENNIAL
BANK'S MOTION TO PROHIBIT USE OF CASH COLLATERAL AS MOOT

*Introduction*

THIS MATTER came before the Court for an evidentiary hearing on July 29, 2011 on the Trustee's Motion for Turnover of Property of the Estate ("Motion for Turnover," Doc. 43) and Creditor Centennial Bank's Motion to Prohibit Use of Cash Collateral (Doc. 40). The Trustee and Centennial Bank ("Trustee") have taken similar positions with regards to the Debtors' post-petition earnings. The Trustee argues that the Debtors' post-petition earnings are actually dividends, or distributions, from non-exempt ownership interests in several corporations. Therefore, the Trustee argues, the monies received post-petition from these corporate entities constitute property of the estate as "proceeds, product, offspring, rents, or profits of or from property of the estate." 11 U.S.C. §541(a)(6). The Debtors, on the other hand, argue that the monies received from these corporate entities are actually wages which are comprised of a base salary plus a "bonus," which is computed by taking 5% of that month's profits. The Debtors, therefore, contend that these post-petition monies should be construed as exempt post-petition "earnings from services performed by an individual debtor after the commencement of the case." *Id.*

1

Having considered the argument of counsel, the evidence presented, and for the reasons set out below, I find that the payments received by the Debtor, Mr. Cook, from his employer should partially be classified as exempt post-petition wages up to $10,000 each month and that the "5% bonus" is actually a distribution of profit from property of the estate and therefore is property of the estate under 11 U.S.C. 541(a)(6). This is a core proceeding and jurisdiction is proper pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(E) (2011).

## *Findings of Fact*

The relevant facts relating to the Trustee's Motion for Turnover are undisputed. The Debtors, Glenda and Hoyt Cook, filed their joint petition for relief under Chapter 7 on May 23, 2011. In January 2008, the Debtor, Hoyt Cook ("Mr. Cook"), entered into a contract with George Gainer to purchase a 33% interest in D&G Automotive, Inc. ("D&G") for $4 million. D&G is essentially a holding company that owns and operates Panhandle Automotive ("Panhandle"), Bay Family of Fine Cars, Inc., and Bay Ford Blountstown, LLC. Collectively, D&G, and its subsidiaries, own and operate various lines of car dealerships including Chrysler/Jeep, Dodge, Hyundai, Lincoln, Ford, and Suzuki. At the time of the purchase of D&G, Cook also received an ownership interest in a vehicle warranty corporation that distributes monies through the D&G entity on an irregular basis.[1]

In order to finance the Debtors' purchase of the D&G stock, the Debtors took out a $3 million loan from Coastal Community Bank[2] secured by the Debtors' interest in D&G (the "D&G Loan"). According to the Debtors' Amended Schedule B, the Debtors, as of the Petition Date,

---

[1] The warranty company has been referred to as APPCO, Inc., North Atlantic, Inc., or North Bay Reinsurance, Ltd. by the Debtors and Mr. Gainer. In any event, the Debtors do not dispute that any distributions from this warranty/reinsurance entity are not exempt and are property of the estate, including the $4,480.16 that the Debtors received on, or after, the date of their Petition.

[2] Centennial Bank now holds the note securing the Debtors interest in D&G as successor in interest to Coastal Community Bank.

2

owned a 3.3% interest in D&G[3], 33.3% interest in Bay Ford Blountstown, LLC, and a 33.3% interest in Bay Family of Fine Cars, Inc. This Chapter 7 petition was precipitated by the D&G purchase, which was evidently Mr. Cook's "worst business decision he had ever made," and Centennial Bank's subsequent actions to collect on the D&G Loan.

In December 2007, prior to the sale of the D&G stock to the Debtors, Mr. Cook and Mr. Gainer discussed the various possibilities of whether Mr. Cook would purchase 33% of D&G or 49%. As a part of those discussions, Mr. Cook wrote down various assumptions of his possible earnings under those two scenarios with a breakdown of different sources of income.[4] After Mr. Cook wrote down the numbers, he, as well as Mr. Gainer, signed the paper. One of the sources of income in both scenarios was an annual salary for Mr. Cook of $120,000, or $10,000/month. Another source of income would be Mr. Cook's percentage of the profits from D&G under either scenario – 33% or 49% ownership. Mr. Cook ended up purchasing 33% of D&G while Mr. Gainer retained the other 67%. Mr. Cook had no previous business experience in the automobile industry, whereas Mr. Gainer had over 40 years of experience. Since his purchase of the D&G stock, Mr. Cook testified that he has worked at the various dealerships owned by D&G around "40 to 50 hours a week." Even though he had no previous experience in the car industry, Mr. Cook had been a reputable and successful businessman in the Panama City area for quite some time and has brought value to D&G and its subsidiaries. Mr. Gainer and Mr. Cook both testified that Mr. Cook is at the various dealerships overseeing the sales teams and the expansion and construction of several buildings.

There is no written employment contract between Mr. Cook and D&G (or any of its subsidiaries), but under the Debtors' Schedule I, the Debtors stated that Mr. Cook earns $16,705/month

---

[3] The Debtor originally purchased 33 shares, which represented 33%, of D&G in 2008. That interest was subsequently diluted by the majority shareholder, Mr. Gainer, when 900 more shares were issued to Mr. Gainer. Thus, the Debtors now own 33 shares out of 1,000 shares of D&G, i.e. 3.3%.

[4] *See* Centennial Bank Ex. 3 (Doc. 78).

3

in gross income from D&G (Doc. 29).  Under Line 17 of the Debtors' Schedule I, the amount of Mr. Cook's income is explained as including "guarantee (sic) salary of $10,000.00 per month plus approximately $6,000.00 per month in bonuses which are not guaranteed." *Id.*  It was further explained by Mr. Cook and Mr. Gainer at the hearing on the Motion for Turnover that Mr. Cook has a base salary of $10,000/month and then receives a "5% bonus" for each month.  The 5% bonus is calculated by taking 5% of the net profit that D&G and its companies bring in each month.  Asked to further explain how the 5% is calculated, Mr. Gainer stated that if the dealerships do not make a profit for any particular month, then neither Mr. Gainer nor Mr. Cook receive their "bonuses." Since Mr. Gainer owned twice as much interest in D&G as Mr. Cook, he would receive a "10% bonus" each month as opposed to Mr. Cook's "5% bonus."  Mr. Gainer further testified that at the end of each year, the remaining profits of the company would be distributed to Mr. Cook and Mr. Gainer pro rata based on their ownership interest in D&G and its subsidiaries. On the other hand, other employees of D&G, and its subsidiaries, who receive commissions or bonuses, are paid such bonus/commission based on gross revenue or sales for their respective departments, and not based on the companies' profitability.  In other words, if D&G and its subsidiaries fail to make a profit in any given month, these employees will still receive their bonus or commission.

As part of the many exhibits entered into evidence regarding Mr. Cook's income, Mr. Cook's pay stubs demonstrated how he is paid his income from D&G and its subsidiaries.  *See* Debtors' Ex. 5.  From the paystubs entered into evidence, Mr. Cook is regularly paid $5,000 every two weeks (subject to applicable withholdings).  In addition to those earnings, Mr. Cook also receives his monthly "bonus" at various times in the month.

4


## *Conclusions of Law*

Section 541(a)(6) of the Bankruptcy Code provides that "proceeds, product, offspring, rents, or profits of or from property of the estate" are property of the estate and subject to distribution by the Trustee. 11 U.S.C. §541(a)(6). Within the same section, the Code also states that a Debtor's post-petition "earnings from services performed" are not property of the estate. *Id*. Moreover, Florida law specifically protects an individual's wages from garnishment or attachment. *See* Fla. Stat. §222.11(2)(b) (2011).[5] Fla. Stat. §222.11(1)(a) defines "earnings" that are protected from garnishment or attachment as "compensation…for personal services or labor whether denominated as wages, salary, commission, or bonus." Thus, the issue before the Court can be framed as whether the monies paid to Mr. Cook by D&G should be construed as exempt wages under § 541(a)(6) of the Code and Fla. Stat. §222.11 or whether they should be deemed as distributions from D&G, and therefore property of the estate under § 541(a)(6).

As I have stated before, § 541 of the Bankruptcy Code "is intended to include in [the] Debtor's estate almost any asset or interest of value Debtor has." *In re McDaniel*, 141 B.R. 438, 439 (Bankr. N.D.Fla. 1992). Moreover, §541 is so broad that if any asset or interest of the Debtor's estate produces proceeds or profits, then those proceeds and profits are also property of the estate. 11 U.S.C. § 541(a)(6).

Mr. Cook claims that all of his earnings are post-petition wages that are beyond the reach of creditors or the Trustee since those earnings represent wages "for personal services." *Id.* Mr. Cook's Schedule I, and the comments attached to it, state a base monthly salary of $10,000/month. Mr. Cook and Mr. Gainer both testified at the hearing that they had agreed to Mr. Cook receiving a salary of $120,000 a year. Both men also testified to the fact that Mr. Cook is at the various dealerships overseeing the sales teams and the expansion and construction

---

[5] There is no dispute as to whether Mr. Cook is the "head of family" as defined in Fla. Stat. §222.11(1)(c) and that his wages are thus protected §222.11(2)(b).

5

of several buildings. Mr. Cook also stated that he works close to 40-50 hours every week. In addition to the testimony of Mr. Cook and Mr. Gainer, a document signed by both men was entered into evidence demonstrating that both men contemplated that Mr. Cook's base salary would be $120,000/month. And after the Debtors' purchase of the D&G stock, the paystubs from various D&G companies demonstrate that Mr. Cook did, in fact, receive a base salary of $120,000. From the evidence and testimony, it is quite evident that Mr. Cook receives a salary for his personal services in the amount of $10,000/month i.e. $120,000 annually. Therefore, Mr. Cook's base salary falls within the exception of § 541(a)(6) of "earnings from services performed by an individual debtor after the commencement of the case" and is not property of the estate.

Mr. Cook also claims that his "5% bonus" should be treated similarly to his base salary since the bonus is a part of his wage structure. The Trustee claims that even though the Debtors classify the 5% distribution as a "bonus," the 5% payment is actually a dividend from D&G's earnings. Black's Law Dictionary defines a dividend as "a portion of a company's earnings or profits distributed pro rata to its shareholders…in the form of cash or additional shares." Black's Law Dictionary 547 (9th ed. 2009). On the other hand, a bonus is defined as a "premium paid in addition to what is due or expected" and is "paid for services." *Id.* at 206. Mr. Gainer testified that he and Mr. Cook (the only shareholders of D&G and its subsidiaries) receive their respective "bonuses" only if D&G made a profit for that month. Since Mr. Gainer and Mr. Cook in total receive 15% of D&G's profits each month, the remaining 85% is retained by D&G and distributed at the end of the year to Mr. Gainer and Mr. Cook pro rata based on their ownership interest. Mr. Gainer further testified that if D&G doesn't make a profit for a particular month, then he and Mr. Cook receive their respective base salaries but will not receive any other monies. By classifying the "5% bonus" as a bonus, the Debtors do not change the true nature of these distributions which are dividends from the corporation based on that month's profits (if any at all). Thus, the

6

monies that have been classified as Mr. Cook's "5% bonus" are actually "proceeds" or "profits" from the Debtors' property of the estate and are, therefore, property of the estate under § 541(a)(6) and should be turned over to the Trustee.

The Debtors also contend that Fla. Stat. §222.11 prevents the Trustee from having any interest in the Mr. Cook's earnings from D&G. As "Head of Family," Mr. Cook's earnings (as defined by §222.11(1)(a)) are properly exempt earnings only so far as that term is defined within the statute. As discussed above, Mr. Cook's $120,000 annual salary is properly exempt wages under §222.11, but the "5% bonus" does not fall within the definition of "earnings" as it is defined in §222.11(1)(a). Fla. Stat. § 222.11(1)(a) (2011). Florida Statute § 222.11 protects compensation for "personal services" and "by inserting the word 'personal' into the key phrase, the [Florida] legislature excluded from this protection income that is derived from passive sources." *In re Montoya*, 77 B.R. 926, 928 (Bankr. M.D. Fla. 1987). The "5% bonus" that Mr. Cook receives is passive income from the investment he made in D&G and so Mr. Cook's "fruit of [his] day-to-day efforts are protected whereas the fruits of his collected wealth are not." *Id.*

*Conclusion*

For the foregoing reasons, Mr. Cook's annual salary of $120,000 is not property of the estate under § 541(a)(6) and as such, is exempt from administration by the Trustee. On the other hand, any monies received by Mr. Cook from D&G, its subsidiaries, or from his interest in the reinsurance company are property of the estate and subject to administration by the Chapter 7 Trustee. Therefore, all monies received by Mr. Cook from D&G, its subsidiaries, and the reinsurance company since the filing of the petition in excess of $10,000 per month are due to be turned over to the Trustee.[6] Moreover, all monies going forward in excess of the $10,000 per month salary

---

[6] Trustee alleges in her Motion for Turnover (Doc. 43) that Mr. Cook has received $32,076

should also be turned over to the Chapter 7 Trustee and subject to administration. Accordingly, it is hereby

ORDERED and ADJUDGED that Trustee's Motion for Turnover of Property of the Estate (Doc. 43) is GRANTED and the Debtors are directed to give to the Trustee any post-petition monies received from D&G, its subsidiaries, and the reinsurance company since the filing of the petition in excess of $10,000 per month.

FURTHER ORDERED and ADJUGED that Centennial Bank's Motion to Prohibit Use of Cash Collateral (Doc. 40) is DENIED as MOOT.

DONE and ORDERED in Tallahassee, Florida this 8th day of August, 2011.

LEWIS M. KILLIAN, JR.
United States Bankruptcy Judge

cc: all parties in interest