UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

In re:

HOYT WILLARD COOK, JR.,                    CASE NO.: 11-50287-LMK
GLENDA ANN COOK,                           CHAPTER: 7

    Debtors.

_____/

ORDER ON OBJECTIONS TO
DEBTORS' CLAIM OF HOMESTEAD EXEMPTION

THIS MATTER came before the Court on the Objections to the Debtors' Claim of Homestead Exemption ("Objections," Docs. 68 and 69) filed by Creditor Centennial Bank and the Chapter 7 Trustee. The Objections seek to disallow the homestead exemption under 11 U.S.C. § 522(o)(4). Section 522(o)(4) provides that a debtor's homestead exemption shall be reduced to the extent that the debtor, with an intent to hinder, delay or defraud a creditor, converted non-exempt assets into exempt assets within ten years of the bankruptcy filing. An evidentiary hearing was conducted on October 28, 2011 and the matter was taken under advisement. Having considered the arguments of counsel, the evidence presented, and the relevant cases, the Objections are overruled for the reasons set forth herein.

**FACTUAL BACKGROUND**

The Debtors, Glenda and Hoyt Cook, filed their joint petition for relief under Chapter 7 on May 23, 2011. Hoyt Cook ("Mr. Cook") had been a reputable and successful businessman in the Panama City area for many years. Mr. Cook's career started with the ownership of retail stores selling various items such as sea shells, clothing and high-end gifts. After profitably selling the retail stores, Mr. Cook's next venture was in the motel industry. Mr. Cook bought, operated and

1

sold a total of three motels making a substantial amount of money on each one. The first two motels sold for a profit of approximately $1 million each. Mr. Cook made $5 million on his third motel which sold sometime between 2005 and 2006. Because of his success with business after business, he and his wife lived very comfortably in a home worth approximately $5 million. It wasn't until Mr. Cook decided to enter into the automobile business that he began to experience financial difficulty.

In January 2008, Mr. Cook entered into a contract to purchase interest in D&G Automotive, Inc. ("D&G") for $4 million. D&G and its subsidiaries own and operate various lines of car dealerships including Chrysler/Jeep, Dodge, Hyundai, Lincoln, Ford, and Suzuki. In order to finance the purchase of the D&G stock, the Debtors took out a $3 million loan from Coastal Community Bank[1] secured by the Debtors' interest in D&G. When the economic bubble burst in 2008, car dealerships suffered greatly. The Debtors began to financially struggle and the D&G purchase became Mr. Cook's "worst business decision he had ever made." In June 2009, Coastal Community Bank pressured the Debtors into selling their home. The property, once valued at $5 million, was sold for approximately $2.3 million. The sale proceeds paid off the remainder of the mortgage on the home and the rest paid down part of the $3 million loan from Coastal Community Bank. The Debtors received nothing as a result of the sale.

After the sale of their $5 million home, the Debtors began to look for a new place to live. Unable to afford a down payment and receive the credit to purchase a new house, the Debtors moved into their vacation home. This property was a mobile home near a lake located in Washington County, approximately twenty-five miles north of the Debtors' previous home in

---

[1] Centennial Bank is the successor in interest to Coastal Community Bank.

Panama City.[2]  During their stay in the mobile home, the Debtors continuously met with realtors and looked for a new house but were thwarted by their inability to obtain financing.

In 2010, the Debtors were informed by their accountant that they were entitled to a tax refund in the amount of approximately $184,769.  When they received the refund on November 10, they were able to make a $155,000 cash down payment on a home with a purchase price of $800,000.  The Debtors were still unable to receive credit at the time, and the property was purchased because of the seller's willingness to owner finance the $650,000 balance.  The home was sold "AS IS" and it required significant repairs.  The Debtors closed on the property on January 3, 2011 and designated it as their homestead.  Since acquiring the home, the Debtors have spent approximately $20,000 from the proceeds of the tax refund on improvements to the property.

In mid-January of 2011, Centennial Bank initiated a lawsuit against the Debtors as a result of their default on the D&G loan.  In March 2011, a judgment was entered in favor of Centennial Bank.  Because of Centennial Bank's actions to collect on the D&G loan, the Debtors filed their joint petition for Chapter 7 relief on May 23, 2011.  The Debtors subsequently filed Schedule C of their bankruptcy petition and claimed the newly acquired home as exempt pursuant to Article X, Section 4 of the Florida Constitution and Florida Statutes §§ 222.01, 222.02 and 222.05.  Centennial Bank, now a creditor in the Debtors' bankruptcy case and the Trustee both object to the claimed exemption arguing that the Debtors converted the proceeds of the non-exempt tax refund to exempt property prior to bankruptcy with the intent to defraud their creditors.

## DISCUSSION

Under the Bankruptcy Code, Florida's homestead exemption may be denied or reduced to the extent a debtor, acting with intent to hinder, delay or defraud his creditors, converted non-exempt assets into exempt assets within ten years of filing the petition for relief.  11 U.S.C. § 522(o)(4).

---

[2] This home was also pledged to secure the obligation to the bank and has since been foreclosed on.

The sole issue before the Court is whether the Debtors' conversion of the proceeds from the non-exempt tax refund into an exempt homestead was done with fraudulent intent.

Section 522(o) was enacted to preclude Florida's "virtually limitless" homestead exemption in instances of fraud. *See In re Osejo*, 447 B.R. 352, 354 (Bankr. S.D. Fla. 2011) (citing case law that found Florida's "virtually limitless" homestead law prompted the enactment of Section 522(o)). Although Section 522(o) curbs the applicability of Florida's homestead exemption, the Eleventh Circuit held that a debtor's Florida homestead exemption claim is presumptively valid. *Colwell v. Royal Int'l Trading Corp. (In re Colwell)*, 196 F.3d 1225,1226 (11th Cir. 1999). Those objecting to the exemption claim must establish by a preponderance of the evidence that a debtor acted with intent to hinder, delay or defraud creditors. *In re Booth*, 417 B.R. 820, 822 (Bankr. M.D. Fla. 2009).

Centennial Bank and the Trustee rely on the badges of fraud approach to establish the Debtors' fraudulent intent. Courts typically use the badges of fraud approach when assessing a debtor's intent under Section 522(o). *Addison v. Seaver (In re Addison)*, 540 F.3d 805, 811 (8th Cir. 2008); *In re Booth*, 417 B.R. 820, 823 (Bankr. M.D. Fla. 2009). Citing *In re Osterman*, 296 Fed. Appx. 900, 902 (11th Cir. 2008), Centennial Bank and the Trustee allege that the badges of fraud that exist in the present case are: 1) "the cumulative effect of the transactions and course of conduct after onset of financial difficulties or threat of suit" and 2) the "retention of possession for use and benefit." Centennial Bank and the Trustee assert that the purchase of an $800,000 waterfront home after defaulting on a $3 million loan, and purchasing the home immediately preceding collection efforts establishes that the Debtors acted with intent to hinder, delay or defraud their creditors. Furthermore, Centennial Bank and the Trustee argue that the Debtors retain the use and benefit of $175,000 of the tax refund given that it was invested in the homestead.

4

The presence of some badges of fraud is not dispositive. *Booth*, 417 B.R. at 823. In the instant case, Centennial Bank and the Trustee have failed to establish by a preponderance of the evidence that the Debtors acted with intent to hinder, delay or defraud their creditors. The Debtors' explanation that the purchase of the homestead using the non-exempt tax refund was to ensure that they had a permanent place to live is credible and realistic. After the sale of their previous home in June 2009, the Debtors met with realtors to look for a new house. Unable to afford a down payment and unable receive credit, they were forced to remain in the small mobile home located twenty-five miles away that they had previously used for vacations. The Debtors never intended to permanently reside in the mobile home. Centennial Bank and the Trustee place emphasis on the fact that the Debtors purchased an $800,000 waterfront home after they had already defaulted on a $3 million loan. While it may seem unreasonable to purchase an $800,000 waterfront property after living in a mobile home, the Debtors actually went from living in a $5 million home to a home worth substantially less. The Debtors' use of the tax refund as a down payment and for repairs on the homestead property was not a fraudulent scheme to keep the proceeds from their creditors. Instead, receiving the tax refund finally gave the Debtors' the opportunity to procure a stable and permanent residence. The public policy behind Florida's homestead law focuses on the establishment and protection of a stable, financially secure primary home. *Reinish v. Clark*, 765 So.2d 197, 210 (Fla. 1st DCA 2000). Denying the homestead exemption here would be contrary to this public policy.

Additionally, I do not find as evidence of fraudulent intent the fact that the Debtors retained the use and benefit of the tax refund given that it was invested in their homestead. The Debtors made the customary down payment of approximately twenty percent of the selling price. The Debtors spent an additional $20,000 from the proceeds of the tax refund on the property because it was sold "AS IS" and required significant repairs. Using the proceeds from the tax

5

refund as a down payment to finance the home and make necessary repairs was reasonable in light of the circumstances.

"Absent extrinsic evidence of fraud…the debtor's mere conversion of non-exempt property to exempt property, even while insolvent, is not evidence of fraudulent intent as to creditors." *Hanson v. First Nat'l Bank in Brookings*, 848 F.2d 866, 868 (8th Cir. 1988).  I find that Centennial Bank and the Trustee have failed to present any extrinsic evidence that establishes that the Debtors acted with the requisite intent to defraud their creditors when they used the tax refund to acquire their homestead.  The circumstances and facts establish the Debtors' primary motivating factor in purchasing the home was to ensure that they had a place to reside. Therefore, I find that the Debtors are entitled to the claimed exemption of their homestead pursuant to Article X, Section 4 of the Florida Constitution.

As discussed at the evidentiary hearing, Section 522(p)(1) caps the homestead exemption at $146,450 for property acquired by a debtor during the 1,215 days preceding the filing of the petition. 11 U.S.C. § 522(p)(1).  Here, the Debtors filed a joint petition for Chapter 7 relief. Section 522(m) provides that the exemption statute applies separately with respect to each debtor in a joint case. 11 U.S.C. § 522(m).  Thus, applying Section 522(p)(1) separately to each debtor would increase the cap of the exemption for joint filers to $292,900. *See In re Rasmussen*, 349 B.R. 747, 755 (Bankr. M.D. Fla. 2006) (noting that the result of applying Section 522(p) separately to each debtor in a joint case would double the limit of the homestead exemption). Therefore, the Debtors' conversion of $175,000 of the tax refund into an exempt homestead is well within the limit of Section 522(p)(1).  Accordingly, it is hereby

ORDERED and ADJUDGED that the Objections to the Debtors' Claim of Homestead Exemption (Docs. 68 and 69) filed by the Creditor Centennial Bank and the Chapter 7 Trustee are OVERRULED.

DONE and ORDERED in Tallahassee, Florida this  December 7, 2011  .

LEWIS M. KILLIAN, JR.
United States Bankruptcy Judge

cc: all parties in interest